## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **WOODLANDS SENIOR LIVING, LLC, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **1:19-cv-00230-JDL** |
| **MAS MEDICAL STAFFING CORP.,** | ) ) ) | |
| **Defendant.** | ) ) | |

## ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Woodlands Senior Living, LLC ("Woodlands") filed a complaint against Defendant MAS Medical Staffing Corporation ("MAS") alleging that MAS actively recruited and solicited Woodlands employees in violation of a contract between the two parties (ECF Nos. 3-2, 37).  MAS has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing that even if it did breach the contract, Woodlands' claims must fail because of a recently enacted Maine law—"An Act to Promote Keeping Workers in Maine," P.L. 2019, ch. 513 (codified at 26 M.R.S.A. §§ 599-A, 599-B (West 2020))—which prohibits the enforcement of restrictive employment agreements (ECF No. 15).  For the following reasons, I grant MAS's motion.

## I.  BACKGROUND

Woodlands initially filed its Complaint in the Kennebec County Superior Court on April 3, 2019, and on May 22, the case was removed to federal court.  On July 21,

2020, Woodlands filed a First Amended Complaint, which added several additional Woodlands facilities as plaintiffs, but which is otherwise identical to the original complaint.[1]  The First Amended Complaint contains one breach of contract count and one quantum meruit count.  The First Amended Complaint alleges the following facts, which I supplement by reference to the contract that is the subject of this case and which is attached to MAS's motion.  *See R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006) ("The court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein . . . .").

Woodlands operates several nursing facilities throughout Maine.  MAS is a New Hampshire corporation which operates as a licensed temporary nursing agency in Maine.   In May of 2016, the parties entered into a contract (the "Staffing Agreement"), in which MAS agreed to refer licensed healthcare professionals for temporary placement at various Woodlands facilities.

The Staffing Agreement included a "Direct Hire" provision governing each party's ability to directly hire employees from the other:

> **Direct Hire**:  In the event [Woodlands] desires to hire a temporary, per diem or contract Healthcare Professional referred by [MAS], [Woodlands] is obligated to pay a placement fee as follows[:] $5000.00 if hired within 6 months of initial shift with [Woodlands] and $2500.00 after 6 months of initial shift with [Woodlands] or agree to a 12 week[,] 40 hour per week contract for said employee.  [MAS] further agrees not to actively recruit or solicit any current employee of any Woodlands

---

[1] While the First Amended Complaint—which names Woodlands Senior Living of Cape Elizabeth LLC, Woodlands Senior Living of Hallowell, LLC, Woodlands Senior Living of Farmington, LLC, Woodlands Senior Living of Rockland, LLC, Woodlands Senior Living of Waterville, LLC, and Woodlands Senior Living of Brewer, LLC as plaintiffs— was filed subsequent to MAS's motion for judgment on the pleadings, the parties agree that the addition of these new plaintiffs "in no way changes the course of litigation."  ECF No. 35 at 2.

> location and should any current or recently past employee apply for a position with [MAS] they will be required to wait 90 days after their last day of employment to be hired by [MAS].

ECF No. 15-1 ¶ 1(d).  Woodlands alleges that MAS violated the Direct Hire provision when it recruited and hired several Woodlands employees without complying with the ninety-day waiting period.

On January 22, 2020, MAS moved for judgment on the pleadings based on Maine's recently enacted law prohibiting the enforcement of restrictive employment agreements, 26 M.R.S.A. § 599-B.[2]  In response, Woodlands argues that the law is inapplicable or, alternatively, that the law violates the Contract Clause of the Maine Constitution, Me. Const. art. I, § 11.  Because Woodlands challenged the constitutionality of a Maine statute, I ordered Woodlands to comply with Fed. R. Civ. P. 5.1 and D. Me. Local R. 5.1 by filing a notice of the challenge with the Maine Attorney General's Office (the "Attorney General").  Woodlands complied, and the Attorney General subsequently filed a motion to intervene, which was granted.  The Attorney General then filed a brief defending the constitutionality of section 599-B. A hearing on all pending issues was held on October 15, 2020.

## II.  LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings bears a strong family resemblance to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and these two types of motions are

---

[2]  MAS also filed a counterclaim for breach of contract (ECF No. 38), alleging that Woodlands failed to provide thirty days' notice prior to cancelling the contract on August 4, 2018.  Woodlands filed a response (ECF No. 48), asserting seven different affirmative defenses.  There are no pending motions with respect to the counterclaim.

treated in much the same way." *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018) (citing *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)).

Accordingly, "[i]n deciding whether to grant judgment for the moving party, the Court must 'accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in [his] favor.'" *Shapiro v. Haenn*, 190 F. Supp. 2d 64, 66 (D. Me. 2002) (quoting *Feliciano v. Rhode Island,* 160 F.3d 780, 788 (1st Cir. 1998)).  "Judgment on the pleadings is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).

## III.  DISCUSSION

On September 19, 2019, roughly five months after Woodlands filed its complaint, 26 M.R.S.A. § 599-B went into effect.  The law provides that "[a]n employer may not: A. [e]nter into a restrictive employment agreement; or B. [e]nforce or threaten to enforce a restrictive employment agreement." § 599-B(2).  The statute defines a "restrictive employment agreement" as an "agreement . . . between [two] or more employers, including through a franchise agreement and subcontractor agreement," which "[p]rohibits or restricts one employer from soliciting or hiring another employer's employees or former employees." § 599-B(1).

MAS argues that section 599-B applies to the Staffing Agreement, maintaining that the Staffing Agreement meets the statutory definition of a restrictive employment agreement; that section 599-B should apply retroactively to encompass the entire action; and that even if the statute does not apply retroactively,

maintenance of the present lawsuit constitutes an "enforcement" of the Staffing Agreement that is prohibited by section 599-B.  Woodlands disputes each of these contentions, and it further argues that the statute violates the Maine Constitution. Woodlands also contends that even if the Staffing Agreement is unenforceable, its quantum meruit claim must survive.  I address each argument in turn.

1.  **The Applicability of Section 599-B to the Staffing Agreement**

   **a. The Staffing Agreement is a "Restrictive Employment Agreement" as Defined by Section 599-B**

Woodlands asserts that section 599-B is inapplicable to the Staffing Agreement for two reasons.  First, it contends that whether the Staffing Agreement is a "restrictive employment agreement" is a "factually intensive question that is not ripe to be decided at this stage of litigation."  ECF No. 19 at 9.  Second, it argues that section 599-B does not apply to the Staffing Agreement because MAS is not an "employer" as required by the statute.

Without elaborating in any significant detail, Woodlands claims that  whether the Staffing Agreement is a "restrictive employment agreement" is a factually-intensive question and is thus not appropriate for the court to determine on a judgment on the pleadings.  However, while fact-finding is indeed "the essence of the jury function," *Estate of Spinosa v. Int'l Harvester Co.*, 621 F.2d 1154, 1160 (1st Cir. 1980), whether the Staffing Agreement is a restrictive employment agreement is an issue of statutory interpretation, because at this stage the facts asserted in Woodlands' complaint are accepted as true, and the resulting question for decision is whether section 599-B applies to the facts alleged in Woodlands' complaint. "Questions of statutory interpretation are questions of law." *Hernández–Miranda v.*

*Empresas Díaz Massó, Inc.*, 651 F.3d 167, 170 (1st Cir. 2011).  Thus, this Court may determine whether the Staffing Agreement is a "restrictive employment agreement" at this stage of litigation.

Woodlands next contends that section 599-B does not apply to the Staffing Agreement because the statute prohibits "restrictive employment agreements," which it defines as agreements between "[two] or more *employers*." § 599-B(1)(A) (emphasis added).  Woodlands argues that MAS is not an "employer" as defined by the statute. The subchapter containing section 599-B provides that "[a]s used in this subchapter, unless the context otherwise indicates, . . . 'Employer' means an individual, partnership, association, [or] corporation. . . ." § 591(2).

MAS is a corporation incorporated in New Hampshire.  However, seizing on the phrase "unless the context otherwise indicates," Woodlands argues that MAS is not an employer under the statute because, as a provider of temporary medical staffing, MAS's business model requires that it impose hiring restrictions on the entities with whom it places its employees.  Furthermore, MAS's employees are placed with medical providers temporarily and "never truly work at any MAS facility or site." ECF No. 19 at 9.  Woodlands argues further that, "given the expectations of all parties involved, including the employee-placements who are the true intended beneficiaries of section 599-B," MAS does not fall within the term "employers."  *Id*.

Woodlands' argument is misplaced, however, because the phrase "unless the context otherwise indicates" refers to the context of the statutory text itself, not the real-world context.  There is no indication in section 591 that this phrase is intended to serve as an invitation to disregard the meaning of statutory terms based on the

factual context in which the statute is being applied.  *See Tanguay v. Seacoast Tractor Sales, Inc.*, 494 A.2d 1364, 1367 (Me. 1985) (evaluating the Used Car Information Act's definition of "dealer," contained within the Act's "Definitions" section, which applied "unless the context otherwise indicates," based on the context of a later section within the same subchapter).  Accordingly, section 591's definition of "employer" applies unless the context of a statutory provision within the subchapter otherwise indicates, which, here, it does not.

Because nothing in the context of the statute indicates that staffing agencies are not "employers," I conclude that MAS is an employer for purposes of section 599-B.

### b. Section 599-B Applies to the Present Action

Woodlands next argues that section 599-B does not apply to the present action because it became effective on September 19, 2019, over five months after the present lawsuit was initiated on April 9, 2019.  MAS asserts both that the Maine Legislature intended for section 599-B to apply retroactively and govern all preexisting contracts and that, even if section 599-B does not apply retroactively, the application of section 599-B here is instead prospective.  Because, as I discuss below, the present application of section 599-B is prospective, I do not reach the issue of whether the statute applies retroactively.

"Legislation is considered retroactive if its application determines the legal significance of acts or events that occurred prior to the statute's effective date." *Liberty Mut. Ins. Co. v. Superintendent of Ins.*, 1997 ME 22, ¶ 9, 689 A.2d 600, 602.[3]

---

[3] Because Woodland's complaint is brought under this Court's diversity jurisdiction, *see* ECF No. 37 ¶ 1, "federal law supplies the applicable procedural rules and state law supplies the substantive rules

"Nevertheless, 'the application of a statute remains prospective if it governs *operative events* that occurred *after* its effective date, even though the entire state of affairs includes events predating the statute's enactment.'" *Id.* (quoting *Barnes v. Comm'r of the Dep't of Human Servs.*, 567 A.2d 1339, 1341 (Me. 1989).  Determination of the "operative event" is therefore critical to the analysis of whether the application of a statute is retroactive or prospective.

Section 599-B lists three prohibited events: entering into a restrictive employment agreement, enforcing a restrictive employment agreement, and threatening to enforce a restrictive employment agreement.  The parties appear to agree that "enforcement" and "attempted enforcement" of a restrictive employment agreement are the relevant operative events prohibited by section 599-B.  However, they disagree as to the meaning of "enforce."  Woodlands argues that enforcement occurs when a party files suit.  *See* ECF No. 19 at 8 ("Woodlands enforced its contract in this case when it filed suit. Period.") (citing *Landmark Infrastructure Holding Co. v. R.E.D. Invs., LLC*, No. 2:15-cv-04064, 2018 WL 2013040, at *2 (W.D. Mo. Apr. 30, 2018) ("Seeking damages for failing to comply with the terms of a contract is enforcing the contract.")).  MAS cites the same sentence from *Landmark Infrastructure Holding* and argues that enforcement (and threatened enforcement) includes not only Woodlands' filing of its complaint but also its continued prosecution of this case seeking damages from MAS.  To determine the meaning of the term "enforce" within section 599-B, I look to Maine's process of statutory interpretation.

---

of decision." *Lawless v. Steward Health Care Sys.*, 894 F.3d 9, 21 (1st Cir. 2018).  In this case, Maine is the source of that state law.

When determining the meaning of a statute, Maine courts have a well-established procedure:

> [W]e first look to the plain language of the provisions to determine their meaning. If the language is unambiguous, we interpret the provisions according to their unambiguous meaning unless the result is illogical or absurd. If the plain language of a statute is ambiguous—that is, susceptible of different meanings—we will then go on to consider the statute's meaning in light of its legislative history and other indicia of legislative intent.

*MaineToday Media, Inc. v. State*, 2013 ME 100, ¶ 6, 82 A.3d 104, 108 (citations and quotation marks omitted).

Here, the plain language of the statute is ambiguous. There is no definition of "enforce" in the statute. Furthermore, Black's Law Dictionary defines "enforce" as "[t]o give force or effect to (a law, etc.)," "to compel obedience to," or "loosely, to compel a person to pay damages for not complying with (a contract)." *Enforce,* Black's Law Dictionary (11th ed. 2019). This definition does not, on its own, provide clear guidance as to when enforcement occurs in the process of litigation. Because the plain language of the statute is not determinative, I turn to the statute's legislative history and other indicators of legislative intent.

The legislative summary of the statute provides little insight as to the intended meaning of "enforce." *See* L.D. 733, Summary (129th Legis. 2019). However, the testimony offered in support of the bill supports a broad interpretation of the word "enforce." The impetus behind the law appears to generally be "[r]emoving unnecessary employment barriers."[4] *An Act to Promote Keeping Workers in Maine:*

---

[4] Much of the testimony focuses on the simultaneously passed section 599-A. As such, it is difficult to parse out the intent for passing section 599-A and the intent for passing section 599-B. The overlapping inspiration for the two sections appears to be a general concern for employment mobility of the working class, as discussed above.

*Hearing on L.D. 733 Before the J. Standing Comm. on Labor, Research & Econ. Dev.*, 129th Legis. 2 (2019) (testimony of Rep. John Schneck); *see also An Act to Promote Keeping Workers in Maine: Hearing on L.D. 733 Before the J. Standing Comm. on Labor, Research & Econ. Dev.*, 129th Legis. 2 (2019) (testimony of Adam Geode, Maine AFL-CIO Legislative & Political Director) (noting that "[w]e don't think it is right that people who struggle to find pay that helps sustain a family are required to forego better job opportunities as a condition of their employment").  If the intent of the bill was to prevent employers from restricting the free movement of employees, it is reasonable to infer that the authors of the bill sought to prevent courts from entering judgments enforcing employment agreements that restrict such free movement, no matter when the underlying complaint was filed.

Furthermore, Maine courts "seek to discern from the plain language the real purpose of the legislation, avoiding results that are absurd, inconsistent, unreasonable, or illogical." *State v. Fournier*, 617 A.2d 998, 999 (1992).  A ruling that section 599-B does not apply to litigation pending at the time the law became effective would lead to a narrow subset of restrictive employment agreements being exempt from the statute's prohibition on the enforcement of restrictive employment agreements, which is counter to the statute's broad goal of removing barriers to employment.

In short, section 599-B is applicable to the Staffing Agreement, as the present application of the statute is prospective rather than retroactive.  Therefore, I turn to whether application of the statute is unconstitutional.

2.     **The Constitutionality of Section 599-B**

Because section 599-B applies to the Staffing Agreement, the next step is to determine whether application of section 599-B to the Staffing Agreement is constitutional.   Woodlands contends that the application of section 599-B to the Staffing Agreement violates the Contract Clause of the Maine Constitution.

The Maine Constitution prohibits the Legislature from passing any law "impairing the obligation of contracts." Me. Const. art. 1, § 11 [5]   "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"   *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)).   "Legislative enactments are presumed constitutional, and the party challenging a statute's constitutionality bears the burden of proof to the contrary." *Am. Republic Ins. Co. v. Superintendent of Ins.*, 647 A.2d 1195, 1197 (Me. 1994).

A three-part test governs the analysis of a Contract Clause claim.   First, the "threshold inquiry . . . is whether the legislation resulted in 'a substantial impairment of a contractual relationship.'"   *Kittery Retail Ventures*, 2004 ME 65, ¶ 38, 856 A.2d at 1194 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).   The challenging party must prove that a contractual relationship exists, that a change in the law impairs that relationship, and that the impairment is substantial.   *Id.* at ¶

---

[5]   The Contract Clause of the United States Constitution similarly provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."   U.S. Const. art. I § 10, cl. 1.   Woodlands has not argued that section 599-B violates the United States Constitution.   However, because the Contract Clauses of the Maine and the United States Constitutions are substantively identical, the Law Court has looked to federal law in analyzing the Contract Clause of the Maine Constitution.   *See, e.g., Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 38, 856 A.2d 1183, 1194-95.

38, 856 A.2d at 1195.

Once a substantial impairment of a contractual relationship has been found, the inquiry becomes whether the impairment is "necessary to serve an important public purpose.'" *Id.* (quoting *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 25 (1977)); *see also Am. Republic Ins. Co.*, 647 A.2d at 1197 ("the State must have 'a significant and legitimate public purpose' for the regulation") (quoting *Energy Reserves Grp.*, 459 U.S. at 411-12).

Finally, once an important public purpose has been found, "the next inquiry is whether the adjustment of 'the rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Grp.*, 459 U.S. at 412 (alterations in original) (quoting *U.S. Tr. Co.*, 431 U.S. at 22).

If, as in this case, the State is not a contracting party, "courts will defer to the judgment of the Legislature regarding necessity and reasonableness." *Kittery Retail Ventures,* 2004 ME 65, ¶ 38, 856 A.2d at 1195 (citing *Energy Reserves Grp.*, 459 U.S. at 412-13).

### a.   Section 599-B Substantially Impairs the Parties' Contractual Relationship

The first inquiry in a Contract Clause claim is whether a contractual relationship exists between the parties.  There does not appear to be a legitimate dispute as to whether a contractual relationship existed between Woodlands and MAS.  MAS does note briefly that Woodlands terminated the contract between the parties on August 4, 2018.  While MAS uses this allegation to argue that "there has

been no contractual relationship between the two parties since August 4, 2018—well before [section 599-B] went into effect," it also concedes that both Woodlands and MAS have ongoing obligations under the contract. ECF No. 59 at 3 n.2. MAS does not provide any additional argument as to why its relationship with Woodlands should not be considered contractual. Given the fact that both parties agree that they entered into a contract, and that MAS is seeking to enforce a statute regarding employment contracts, I find that the parties do have a contractual relationship.

The next question is whether the parties' contractual relationship is substantially impaired by section 599-B. To determine whether a contract has been substantially impaired, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018). The Supreme Court has noted that the "[t]otal destruction of contractual expectation is not necessary for a finding of substantial impairment," *Energy Reserves Grp.*, 459 U.S. at 411, although "[m]inimal" impairments are likely not protected by the Contract Clause, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). "The severity of the impairment is both the focus of the first step and a means to calibrate the second [and third] step[s]; that is, the more severe the impairment, the higher the level of scrutiny a court will apply." *21st Century Oncology, Inc. v. Moody*, 402 F. Supp. 3d 1351, 1358 (N.D. Fla. 2019) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 n.31 (1987)).

Here, the parties disagree as to the primary purpose of their contractual bargain, and thus as to whether that bargain has been substantially impaired. MAS

argues that the purpose of the Staffing Agreement between the parties was for MAS to provide temporary placement services to Woodlands, and for Woodlands to pay MAS for those services.  The Attorney General echoes this argument, noting that the provision of the contract requiring MAS to provide temporary employees to Woodlands would remain in effect even if the hiring and recruitment restrictions are unenforceable.[6]

Woodlands, however, argues that "[t]here is an obvious and unstated corollary to an employer's need for 'temporary placement services' and willingness to pay a premium for those services under the terms of a staffing agreement: the staffing agency receiving a premium should not be taking the employer's employees while making a premium sending it more expensive placements."  ECF No. 57 at 3.  In other words, "Woodlands contracted with MAS to fix and not exacerbate its staffing problems."  *Id.*  It argues that the contract directly prohibits MAS from soliciting, recruiting, and hiring Woodlands employees, and that section 599-B substantially impairs that contractual obligation.

The Northern District of Florida analyzed a similar issue: a state statute voiding noncompete agreements between physicians and entities employing all physicians in a given specialty in a given county.  *See 21st Century Oncology*, 402 F.

---

[6]  MAS also argues that section 599-B does not impair the hiring restriction in the Staffing Agreement, which requires "any current or recently past employee" of Woodlands to "wait 90 days after their last day of employment to be hired by MAS Medical Staffing," because this is a restriction on employees as opposed to MAS.  ECF No. 15-1 at 1.  Additionally, MAS argues that the Staffing Agreement's restriction on MAS soliciting and recruiting employees is not impaired by section 599-B because the contract is no longer in effect.  However, the nature of MAS's invocation of section 599-B as a defense to its alleged breach of contract reveals the statute's substantial impact on the Staffing Agreement's Direct Hire provision.  This is particularly true given the fact that—as discussed above—the statute prohibits the enforcement of restrictive hiring agreements even where the contract has been terminated but enforceable contractual obligations still exist.

Supp. 3d at 1356. The court noted that "the noncompete agreements at issue . . . [were] not standalone contracts but [were] instead considered part of the employment agreements between [the] Plaintiff and the physicians it employ[ed]." *Id.* at 1359. However, it further noted that the noncompete agreements' "value to Plaintiff [was] not *de minimis*," and it found that the parties' "noncompete agreements [were] a significant feature of the employment contracts. . . . By voiding the noncompete agreements, [the statute] substantially impair[ed] Plaintiff's employment contracts." *Id.*

The same is true here. While section 599-B does not impair the entire Staffing Agreement between Woodlands and MAS, it does impair an important piece of the parties' contractual bargain—that the party providing Woodlands with temporary staffing would not also poach staff from Woodlands. In other words, while the statute does not totally destroy the parties' contractual expectations, it does undermine a significant feature of those expectations.

Accordingly, I find that section 599-B does substantially impair the parties' contractual relationship. I therefore examine the public purpose of the statute, and then whether the impairment of the contract reasonably serves that purpose. However, because the statute does not completely impair the Staffing Agreement, I do not apply a heightened level of scrutiny. *See 21st Century Oncology*, 402 F. Supp. 3d at 1359.

### b. Section 599-B is Necessary to Serve an Important Public Purpose

The next inquiry is whether the statute impairing the contract is necessary to serve an important public purpose. *Kittery Retail Ventures*, 2004 ME 65, ¶ 38, 856

A.2d 1195; *see also Energy Reserves Grp.*, 459 U.S. at 411 (noting that the State must have "a significant and legitimate public purpose behind the regulation"). This requirement "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Grp.*, 459 U.S. at 412. Legislation designed to remedy "a broad and general social or economic problem" has been found to have an important public purpose, *id.* (citing *Allied Structural Steel*, 438 U.S. at 247, 249), and "[t]he public purpose need not be addressed to an emergency or temporary situation," *id.* (citing *U.S. Tr. Co.*, 431 U.S. at 22 n.19, and *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 39-40 (1940)).

As noted above, when the state is not a contracting party, courts will defer to the judgment of the legislature regarding necessity. *See Kittery Retail Ventures,* 2004 ME 65, ¶ 38, 856 A.2d at 1195 (citing *Energy Reserves Grp.*, 459 U.S. at 412-13). However, "[t]he legitimacy of an asserted public purpose supporting the impairment of a contract can be undercut by a showing that the challenged law is intended to confer a private benefit to special interest groups rather than serving the proffered legitimate interest." *21st Century Oncology*, 402 F. Supp. 3d at 1360 (citing *Energy Reserves Grp.*, 459 U.S. at 412, and *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002)).

The Attorney General and MAS argue that section 599-B is designed to protect workers by prohibiting noncompete agreements and anti-poaching agreements. They cite to the testimony of the law's sponsor, who testified that such agreements are "abusive contract provisions [that] prevent workers from moving to better jobs and advancing their careers." *See An Act to Promote Keeping Workers in Maine: Hearing*

16

*on L.D. 733 Before the J. Standing Comm. on Labor, Research & Econ. Dev.*, 129th Legis. 2 (2019) (testimony of Rep. John Schneck).  As the Attorney General notes, the Staffing Agreement illustrates this very point, as it restricts the ability of Woodlands workers to obtain a potentially better job at MAS by forcing those workers to wait ninety days, potentially without pay or benefits.  The Attorney General also notes that anti-poaching agreements are often disfavored by courts.

Woodlands does not appear to dispute the fact that the broad purpose of section 599-B is legitimate.  *See* ECF No. 57 at 4 (referencing "the admittedly legitimate purpose of prohibiting 'no poach agreements'").  Rather, it appears to take issue with the breadth of the statute's reach, which I address in the third prong of the Contract Clause analysis.  Accordingly, particularly given the required deference to the Legislature, I accept MAS and the Attorney General's contention that section 599-B has a valid public purpose.

### c.    The Adjustment of the Rights and Responsibilities of the Contracting Parties is Based Upon Reasonable Conditions and of a Character Appropriate to the Public Purposes Justifying Section 599-B's Adoption.

The final piece of the Contract Clause analysis is whether "the adjustment of 'the rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption,'" *Energy Reserves Grp.*, 459 U.S. at 412 (alterations in original) (quoting *U.S. Tr. Co.*, 431 U.S. at 22), or, in other words, whether "the means chosen to implement" the legitimate public purpose behind the legislation are reasonable, *id.* at 418.  When the State is not a contracting party, it is also given

deference with regard to this "reasonableness" prong of the Contract Clause analysis. *Id.* at 412-13, 418.

Woodlands argues that the scope of section 599-B is too broad to achieve its stated public purpose of protecting workers.  Woodlands notes that the testimony of the law's sponsor focused specifically on the context of franchisors requiring anti-poaching agreements from franchisees.  *See An Act to Promote Keeping Workers in Maine: Hearing on L.D. 733 Before the J. Standing Comm. on Labor, Research & Econ. Dev.*, 129th Legis. 2 (2019) (testimony of Rep. John Schneck) ("These abusive contract provisions prevent workers from moving to better jobs and advancing their careers and it is not uncommon for franchisors to require franchisees to sign no-poaching agreements that prevent their workers from moving between locations.").  Woodlands argues that while restrictions against anti-poaching agreements are valid in the context of franchise agreements, they become unreasonable in the context of contracts between employers in need of temporary staffing and the staffing agencies that fill that need.  Unlike a franchise that could potentially cover a broad swath of an industry, Woodlands notes that the Staffing Agreement restricts workers' employment at only one staffing agency: MAS.  Accordingly, Woodlands argues that the business interests of employers with temporary staffing needs are unreasonably impaired by section 599-B.

Despite Woodland's contentions, the scope of section 599-B is reasonable given the breadth of its public purpose of protecting workers by prohibiting anti-poaching agreements, which—as discussed above—the parties agree is legitimate.  There is nothing in the statute or legislative materials indicating that the Legislature

intended to limit the statute's anti-poaching restrictions to franchise agreements. Indeed, the law applies to all "agreement[s] . . . between [two] or more employers, *including through a franchise agreement or a contractor and subcontractor agreement*." 26 M.R.S.A. § 599-B(1)(A). If the Legislature sought only to protect against restrictive employment agreements in the context of franchise agreements, it would not have specified franchise agreements as only one of the restrictive "agreement[s] . . . between [two] or more employers" that it sought to disallow. *See Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667, 671 ("Words in a statute must be given meaning and not treated as meaningless and superfluous.") (internal quotation marks omitted).

Because section 599-B's plain language and legislative history show a legislative intent to address all restrictive hiring agreements, the statute's impairment of the Staffing Agreement's Direct Hire provision is in keeping with the statute's purpose. As discussed above, the Staffing Agreement is a restrictive hiring agreement with an anti-poaching agreement: exactly what the Legislature found damaging to the rights of workers. Therefore, particularly given the presumption of constitutionality and the deference given to the Legislature at this stage of the analysis, section 599-B's "adjustment of the rights and responsibilities of the contracting parties" is reasonable. *Energy Reserves Grp.*, 459 U.S. at 412. Accordingly, application of section 599-B to the Staffing Agreement does not violate the Contract Clause of the Maine Constitution.

19

### 3.      Woodlands' Quantum Meruit Claim

Woodlands argues that even if the Staffing Agreement is invalid under section 599-B, its "quantum meruit claim must survive" because "services were rendered under circumstances that were consistent with the contract that MAS and Woodlands entered into and MAS blatantly violated the terms of the contract."  ECF No. 19 at 12-13.  Accordingly, Woodlands claims that it "is entitled to restitution to the extent that MAS has obtained a benefit" from MAS's alleged breach of contract.  *Id.* at 13.

Under Maine Law, quantum meruit, also known as "contract implied in fact," is a legal remedy that "involves recovery for services or materials provided under an implied contract." *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269, 271.  Where an express contract exists, a claim for quantum meruit may nevertheless co-exist where the rendered services at issue were "outside the scope of the [express] contract." *Jay Cashman, Inc. v. Portland Pipe Line Corp.*, 559 F. Supp. 2d 85, 105-06 (D. Me. 2008) (interpreting Maine law).  However, "[w]hen two parties have agreed upon specific and unambiguous terms of compensation for specified services by means of an express contract, as in the present case, the law should be most hesitant to imply a second contract, which covers the same subject matter, if the evidence does not compel an inference that the parties intended to make one. *Aroostook Valley R. Co. v. Bangor & Aroostook R. Co.*, 455 A.2d 431, 433 (Me. 1983).

Here, Woodlands specifically argues that the services at issue "were consistent with the contract that MAS and Woodlands entered into."  ECF No. 19 at 13.  Accordingly, there is no sound reason for the court to nevertheless award damages on the theory that a second, implied contract exists.  It is a "well-established principle

that courts will not enforce illegal contracts, or contracts which are contrary to public policy, or which are in contravention of the positive legislation of the state." *Corbin v. Houlehan*, 61 A. 131, 133 (Me. 1905).  Because a portion of the parties' express contract is unenforceable due to section 599-B, Woodlands cannot prevail on a claim for damages based on an implied contract of identical scope.

## IV.  CONCLUSION

For the reasons discussed above, Defendant MAS Medical Staffing Corporation's Motion for Judgment on the Pleadings (ECF No. 15) is **GRANTED**, and Woodlands' First Amended Complaint (ECF No. 37) is **DISMISSED.**

**SO ORDERED.**

**Dated:  November 23, 2020**

_____**/s/ JON D. LEVY**_____
**CHIEF U.S. DISTRICT JUDGE**